IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THE UNITED STATES OF AMERICA   :
:
:
:
v.      :   CRIMINAL NO. 24-cr-0305
:
DESHAWN TAYLOR   :
:
:
:

## MEMORANDUM OF LAW

Defendant Deshawn Taylor ("Taylor") is charged with one count of possession with intent to distribute a controlled substance; one count of possession of a firearm in furtherance of a drug trafficking crime; and one count of possession of a firearm by a felon. 21 U.S.C. § 841(a)(1), (b)(1)(C); 18 U.S.C. § 924(c)(1)(A)(i); 18 U.S.C. § 922(g)(1). Taylor now moves to suppress the following evidence: a Taurus Model G3C semi-automatic pistol; ten rounds of ammunition; one flip-top container of crack cocaine; twelve Ziploc bags of methamphetamine; twenty flip-top containers of cocaine; forty-three bromazolam tablets; his verbal statements at the scene; and the later obtained DNA evidence and its results. For the reasons below, the Court hereby denies Taylor's motion to suppress in its entirety.

## FACTUAL BACKGROUND

On February 23, 2024, around 9:00 p.m., Officers Cory Kelly and John Yeager of the Philadelphia Police Department (PPD) were on patrol near 700 East Clearfield Street, located in the Kensington area of Philadelphia and in the city's 24th Police District. Tr. of Suppression Hr'g 7:8–8:4, ECF No. 32 (hereinafter Tr.). Both officers have extensive experience within the 24th Police District and both are members of the "5B," a tactical unit that specializes in handling violent crimes including those involving guns and drugs. Tr. 5:2–6:7; see also ECF No. 26 at 2 n.1

[hereinafter Government's Resp. to Def.'s Mot. to Suppress].  During the suppression hearing on February 18, 2025, Officer Kelly testified to having made between twenty-five and thirty firearm arrests or firearm recoveries in 2023.  Tr. 6:18–6:23.

700 East Clearfield Street is a high crime area that is known for violence and its open-air drug market.  Tr. 8:5–8:12.  Officers Kelly and Yeager learned that another officer in an unmarked police car was going to conduct a pedestrian stop near 1800 Clementine Street.  Tr. 10:14–10:23.  Officers Kelly and Yeager remained close by to 1800 Clementine Street to monitor the situation and as backup to their fellow officer.  Tr. 10:23–11:3.  At approximately 8:54 p.m., while the officers were stopped at a red light at the corner of 700 East Clearfield Street, they observed a man (later identified as Taylor) walking southbound on the 3100 block of Kensington Avenue, away from the area in which the pedestrian stop was occurring.  Tr. 9:22–11:18.  Officer Kelly stated that he saw Taylor repeatedly adjusting an object in the front of his waistband.  Tr. 12:22–13:6.  Officer Kelly stated that his prior experience led him to believe that Taylor might be concealing a firearm, whereas Taylor claimed that his movements are akin to "what many men do."  Tr. 13:7–13:21; see also ECF No. 22 at 12 [hereinafter Def.'s Mot. to Suppress].

Footage from a video camera at the corner of Emerald and Clearfield Streets shows that the officers initially drove past Taylor before making a U-turn at 20:53.50 p.m. and pulling up alongside him around 20:54.17.  Tr. 18:21–20:5.  As Officer Yeager stopped the car next to Taylor, Officer Kelly testified that he shined his flashlight out from the passenger seat and asked Taylor if he had a gun.[1]  Tr. 15:11–15:14; 27:22–28:3.  Officer Kelly testified that Taylor repeated the question back to the officers and verbally stated that he did not have a gun.  Tr. 16:5–16:8; see also

---

[1]     Taylor asserted that at some point during the initial interaction one of the officers exited the vehicle, but the body-worn camera footage indicates that both officers remained in the car while they spoke with Taylor.  Def.'s Mot. to Suppress at 1; see also Government's Resp. to Def.'s Mot. to Suppress at 3.

Def.'s Mot. to Suppress at 3.  Taylor then lifted the back of his shirt to indicate that he did not have a firearm.  Tr. 15:14–15:18; see also Def.'s Mot. to Suppress at 3.  Officer Kelly then asked for Taylor to lift the front of his shirt and show his front waistband because Officer Kelly had previously seen Taylor adjusting an object in that area.  Tr. 15:17–15:19.  During this initial interaction, the officers remained inside their vehicle, did not brandish a weapon, did not block Taylor's path, nor commanded Taylor to put up his hands or stop walking.  Tr. 28:22–30:3.  Immediately after Officer Kelly asked to see the front of Taylor's waistband he fled on foot.  Tr. 15:17–15:19.  This initial encounter between Taylor and the officers lasted about five seconds.  Tr. 16:15–16:19.

As Taylor ran, the officers followed him in their patrol car.  Tr. 16:20–17:6.  Taylor first ran eastbound on the 1800 block of Clearfield Street and then turned southbound onto the 3000 block of Emerald Street.  Tr. 16:20–16:24.  The Government asserted that as Taylor fled, he again appeared to be adjusting his waistband, whereas Taylor claimed that the video instead showed both of his arms swinging in front of him as he ran. (Tr. 60:7–62:12.  When Taylor was running down Emerald Street, Officers Kelly and Yeager observed Taylor slightly crouch down between cars parked on the street.  Tr. 17:15–18:3.  Taylor then turned and ran east down the 2000 block of Elkhart Street and the officers continued to follow him.  Tr. 17:3–17:7.

Taylor eventually stopped running around the middle of the 2000 block of East Elkhart Street.  Tr. 17:6–18:8.  The officers' pursuit of Taylor lasted less than one minute.  Tr. 30:15–30:24.  When Taylor stopped running, Officer Kelly exited the vehicle.  Tr. 30:15–31:8.  Without being asked, Taylor stated that he did not have a gun and that he only had one bundle of heroin in his pocket.  Tr. 31:8–31:11.  The officers then frisked Taylor for weapons.  Tr. 31:12–32:9.  The officers recovered $744 and clear Ziplock bags containing a powdery white substance that

resembled heroin.  Tr. 32:10–32:17.  After Taylor admitted to possessing heroin and the officers found the powder-filled bags, Officer Yeager placed Taylor under arrest and placed him in the back of the patrol car.  Tr. 32:14–32:23.  The officers then conducted a more thorough search incident to Taylor's arrest.  Tr. 39:3–39:9.  During the search of Taylor, Officer Yeager recovered a container filled with a chalky substance resembling crack cocaine; twelve Ziplock bags containing a substance that appeared to be methamphetamine; twenty-six containers containing a white chunky substance consistent with crack cocaine; twenty containers containing a white powder consistent with cocaine; and forty-three rectangular green pills.  Tr. 39:7–40:18.

The officers believed that Taylor discarded a firearm while running from them because Taylor had crouched down behind cars during his flight.  Tr. 32:20–33:7.  After Officer Yeager arrested and searched Taylor, Officer Kelly and other responding officers retraced Taylor's steps to find the alleged discarded weapon.  Tr. 34:12–38:18.  When Officer Kelly was near 3079 Emerald Street looking for a weapon, he overheard an individual who had recently parked their car state that there was a gun on the ground.  Tr. 34:12–35:10.  Officer Kelly investigated that area and recovered a black semi-automatic pistol loaded with ten rounds of ammunition.  Tr. 35:13–35:15; see also Government's Resp. to Def.'s Mot. to Suppress at 4.  Detectives later obtained surveillance footage that they alleged showed Taylor "slide" some sort of object near 3079 Emerald Street—the area where Officer Kelly recovered the gun.  Tr. 35:16–38:2.

Following Taylor's arrest, the government obtained a search warrant for Taylor's DNA to compare it to a sample taken from the firearm recovered at 3079 Emerald Street.  Def.'s Mot. to Suppress at 4.

In Taylor's motion to suppress, he claims he was unlawfully seized during his initial conversation with the officers when the officers asked if he had a gun, and after, asked him to lift

the front of his shirt.  Tr. 53:20–55:9.  Taylor also asserts that the search incident to arrest was not supported by probable cause.  Def.'s Mot. to Suppress at 14–15.  Taylor thus argues that the gun, drugs, and his on-scene statements must be suppressed because they were obtained during a search and seizure not supported by reasonable suspicion or probable cause.  Def.'s Mot. to Suppress at 15–16.  Similarly, Taylor moves to suppress the DNA sample and its results as fruits of an illegal search and seizure.  Def.'s Mot. to Suppress 15–16.

The Government, however, asserts that Taylor was not seized until after he fled from the officers and that the seizure was properly rooted in reasonable suspicion that there was criminal activity afoot.  Tr. 63:5–64:2.

## LEGAL STANDARD

The Fourth Amendment protects individuals from unreasonable searches and seizures.  U.S. Const. amend. IV.  The burden of proof to suppress evidence is initially with the defendant.  United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995).  "However, once the defendant has established a basis for his motion, i.e., the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable."  Id. (emphasis omitted).  The government must demonstrate that the search or seizure was reasonable by a preponderance of the evidence.  United States v. Lowe, 791 F.3d 424, 432 n. 4 (3d Cir. 2015).

When a search or seizure is in violation of the Constitution, the exclusionary rule precludes evidence at trial that was directly obtained from the search or seizure.  Herring v. United States, 555 U.S. 135, 139 (2009).  Similarly, the "fruit of the poisonous tree" doctrine prevents evidence indirectly flowing from an unlawful search or seizure from being used in a criminal trial.  United States v. Smith, 575 F. Supp. 3d 542, 550 (E.D. Pa. 2021) (citing Segura v. United States, 468 U.S. 796, 804 (1984)); United States v. Hester, 910 F.3d 78, 84 (3d Cir. 2018).

## DISCUSSION

### I.    THE SEIZURE WAS SUPPORTED BY REASONABLE SUSPICION.

The Fourth Amendment protects individuals from unreasonable searches and seizures. U.S. CONST. amend. IV.  Generally, for a search or seizure to be considered reasonable within the meaning of the Fourth Amendment "it must be effectuated with a warrant based on probable cause."  United States v. Brown, 448 F.3d 239, 244 (3d Cir. 2006).  "Warrantless searches and seizures are presumptively unreasonable and are therefore prohibited under the Fourth Amendment, unless an exception applies."  Hester, 910 F.3d at 84.

As an exception to the general rule, an officer may lawfully execute a "brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot."  Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (citing Terry v. Ohio, 392 U.S. 1, 30 (1968)).  "The reasonable suspicion that justifies the Terry stop of a suspect also justifies a subsequent protective frisk of that suspect, where officers have reason to believe that the suspect may pose a danger to the officers."  United States v. Lowe, 791 F.3d 424, 430 (3d Cir. 2015) (citing Terry, 392 U.S. at 30).  Any evidence obtained through a Terry stop not supported by reasonable suspicion must be suppressed prior to trial.  See Wong Sun v. United States, 371 U.S. 471, 487 (1963); Brown, 448 F.3d at 244.

In determining whether a seizure was unlawful under the Fourth Amendment, a court must first determine at what point the seizure of the defendant occurred.  United States v. Torres, 534 F.3d 207, 210 (3d Cir. 2008); Johnson v. Campbell, 332 F.3d 199, 205 (3d Cir. 2003).  "Flight from a lawful frisk or arrest can contribute to a finding of reasonable suspicion; thus, the timing of the seizure could tip the finding in favor of one party or the other."  Brown, 448 F.3d at 245. After a court has made the determination as to when the seizure occurred, then the court can

determine whether the seizure was lawfully supported by reasonable suspicion. <u>Campbell</u>, 332 F.3d at 206. Courts look to the totality of the circumstances to determine if there was reasonable suspicion to seize a defendant. <u>United States v. Cortez</u>, 449 U.S. 411, 417 (1981).

**A. The Officers Did Not Seize Taylor Until He Fled.**

In the instant matter, the seizure occurred only after Taylor fled from the initial encounter with the police officers. Not every street encounter between law enforcement and civilians is necessarily considered a <u>Terry</u> stop; rather, police officers can question and converse with an individual if that individual consents. <u>See</u>, <u>e.g.</u>, <u>United States v. Drayton</u>, 536 U.S. 194, 200 (2002); <u>United States v. Smith</u>, 575 F.3d 308, 313 (3d Cir. 2009); <u>see also</u> <u>United States v. Lockett</u>, 406 F.3d 207, 211 (3d Cir. 2005) (holding that an officer simply asking someone questions on the street requires something more to become a seizure); <u>United States v. Brown</u>, 765 F.3d 278, 289 (3d Cir. 2014) (holding that multiple officers approaching the defendant and engaging him in conversation was a "mere encounter" rather than a seizure); <u>United States v. Williams</u>, No. 23-2980, 2025 WL 101068 (3d Cir. Jan. 15, 2025) (holding that officer's hand hanging out of the window was not a gesture for defendant's car to stop nor a show of authority, but rather amounted to the beginning of a "mere encounter"). An encounter is only a seizure if there is either: (1) use of physical force to restrict an individual's movement or (2) where an individual submits to a "show of authority." <u>United States v. Lowe</u>, 791 F.3d 424, 430 (3d Cir. 2015). Taylor's initial five-second interaction with the officers was not a seizure because he did not submit to the officers' show of authority. Taylor's seizure occurred when the officers frisked Taylor after he fled.

**1. *There was No Show of Authority Before Defendant Fled.***

The officers' actions prior to Taylor's flight did not present a show of authority; rather, Taylor submitted to the officers' show of authority during the frisk, which occurred after Taylor's

flight. In determining whether there was a show of authority, courts use an objective test of whether "a reasonable person would have believed that he was not free to leave." United States v. Brown, 448 F.3d 239, 245 (3d Cir. 2006) (quoting California v. Hodari D., 499 U.S. 621, 628 (1991)). Factors such as the "threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled" may point toward the fact that there was a show of authority. United States v. Amos, 88 F.4th 446 (3d Cir. 2023) (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980)). A court must consider "all the circumstances surrounding the encounter" in determining whether a seizure occurred. Amos, 88 F.4th at 451.

When an officer draws a weapon and demands an individual to show their hands there is a clear show of authority. United States v. Lowe, 791 F.3d 424, 435 (3d Cir. 2015). In Lowe, three marked police cars "hurriedly" converged around the defendant outside of a residence at 4:00 a.m. and four uniformed officers exited their vehicles and repeatedly demanded the defendant show his hands, before eventually drawing a weapon on the defendant. Id. at 431-32. The court in Lowe found that the presence of multiple police cars and officers, the display of police weapons, and the late hour all indicated that a reasonable person would have not felt free to leave or to decline this interaction. Id. at 432.

Taylor's initial encounter with the officers in this case is distinguishable from the facts presented in Lowe. A reasonable person in Taylor's position would not have felt they were unable to leave simply because an officer spoke with them for only five seconds. Taylor seeks to draw a parallel between the circumstances of his interaction with the officers and that of the seizure in Lowe. However, Taylor's initial interaction with the officers includes very few, if any, of the

factors that were present in <u>Lowe</u>.  In <u>Lowe</u>, four police officers in three separate marked squad cars quickly converged on the defendant in a rather intimidating manner.  Conversely, in the instant matter, there were only two officers in one vehicle that approached Taylor.  Moreover, the record in <u>Lowe</u> indicates that the officers approached the defendant at high velocity, which could imply a threatening demeanor.  Although Officers Kelly and Yeager made a U-turn and pull up alongside Taylor, the record does not indicate that this occurred at a high speed.  Additionally, where the police officers in <u>Lowe</u> clearly asserted some sort of physical and authoritative dominance over the defendant by getting out of their cars—with one officer brandishing a firearm in addition to demanding the defendant show his hands—it can hardly be said that the officers in the instant case approached Taylor with similar intensity and gusto.  Here, the officers engaged in a brief encounter with Taylor, while remaining in their car, and did not brandish a firearm nor demand that Taylor show his hands.  Therefore, the officers' conduct would not have caused a reasonable person in Taylor's position to feel as if they were not free to leave.

Defendant's initial interaction with police is analogous to the facts in <u>United States v. Smith</u> and <u>United States v. De Castro</u>, where the Court opined that the actions of the officers did not constitute a show of authority.  <u>See</u> <u>United States v. Smith</u>, 575 F.3d 308, 314 (3d Cir. 2009) (holding that there was no show of authority when officer repeatedly asked the defendant the location of his girlfriend's house); <u>United States v. De Castro</u>, 905 F.3d 676, 677 (3d Cir. 2018) (holding that there was no show of authority where a police officer approached the defendant on the street and in a "polite, conversational, and non-threatening tone" asked the defendant to remove his hands from his pockets).  In contrast to <u>Smith</u> where the officer asked the defendant repeatedly "Where is your girl's house?" the officers in this case asked Taylor one time whether he had a gun.  Because the <u>Smith</u> Court held that repeating the same investigatory question to a defendant was

not a show of authority, it follows that the five-second interaction where the officers asked Taylor once if he had a gun is not a show of authority.  As in De Castro, where the officers simply requested the defendant to remove his hands from his pockets, the officers here merely asked Taylor to lift his shirt.  Both in De Castro and this case, the officers used a conversational and non-aggressive tone to make a request that was permissive and non-obligatory, rather than a *command* that a reasonable person would not have ignored.  Taylor's initial encounter with officers was extremely brief and the officers' actions of asking whether he possessed a gun and to lift his shirt appeared permissive in nature.  A reasonable person would not have felt unable to leave or required to continue engaging with the officers.  Therefore, there was no show of authority during Taylor's initial interaction with police.

> ### 2. *Even if the Officers Made a Show of Authority During the Initial Encounter, Taylor Did Not Submit Until He Ceased His Flight.*

Assuming arguendo that the officers did in fact display a show of authority during the initial encounter, no seizure occurred because Taylor did not submit until *after* his flight.  "[I]f the police make a show of authority and the suspect does not submit, there is no seizure."  United States v. Valentine, 232 F.3d 350, 358 (3d Cir. 2000).  Where there is a show of authority without submission, this would constitute "at most an attempted seizure."  Brendlin v. California, 551 U.S. 249, 254 (2007).  Once a defendant has submitted, however, the "submission is not negated just because he later tries to flee."  United States v. Sears, 835 F.App'x 671, 673 (3d Cir. 2020) (citing United States v. Coggins, 986 F2d 651, 654 (3d Cir. 1993)).  However, "momentary compliance" with an officer's request or command is not necessarily a submission to any sort of authority.  Valentine, 232 F.3d at 359; see, e.g., United States v. Amos, 88 F.4th 446, 453 (3d Cir. 2023) (holding that defendant did not submit when he raised his hands slightly in the air, stopped for

about a second, and then fled on foot); <u>United States v. Higdon</u>, 493 F.App'x 261, 265 (3d Cir. 2012) (holding that defendant did not submit by briefly looking at the officers before walking away from them).

The Defense asserts that Taylor's verbal response was a submission to a show of authority. Responding verbally to an officer's question does not mean that a defendant submitted to a show of authority. <u>Valentine</u>, 232 F.3d at 359. In <u>Valentine</u>, uniformed police officers stepped out of their vehicle and approached three men in a parking lot after an anonymous informant told them that there was a man with a gun in the area. <u>Id.</u> at 353. An officer told the defendant to come over and place his hands on the squad car, to which the defendant responded, "Who, me?" before attempting to charge past the officer. <u>Id.</u> The <u>Valentine</u> Court held that even though the defendant made eye contact with the officers and verbally responded to them, these acts were merely momentary compliance, rather than the defendant submitting to the officer's authority "in any realistic sense." <u>Id.</u> at 359. The defendant protested that he did submit to authority because he stopped and gave the officers his name, but even accepting that as true, the <u>Valentine</u> Court determined that would still be momentary compliance. <u>Id.</u>

Taylor's verbal response to the officers in the initial five-second-long interaction was merely "momentary compliance" with the officers' line of questioning. As in <u>Valentine</u>, where the defendant briefly stopped and spoke to the officers while holding eye contact before running past them, Taylor had a brief moment where he responded to the officers' question and complied with their request by lifting the back of his shirt. The initial interaction, where Taylor spoke with police and lifted shirt, was only five-seconds long. Five seconds in and of itself is just a "moment." Even if the officers *did* in fact present a show of authority to Taylor at the time of the initial encounter, Taylor answering a question and lifting his shirt during their five-second

interaction exhibited no more than mere "momentary compliance." Therefore, Taylor did not submit to the officers during this initial interaction.

For the reasons above, Taylor was seized under the Fourth Amendment only after he ceased his flight from officers.

**B. The Officers Had Reasonable Suspicion to Seize Taylor After He Fled.**

The officers had the reasonable suspicion necessary to conduct a Terry stop and then frisk Taylor. Brief investigatory stops are considered "seizures" under the Fourth Amendment. See Terry v. Ohio, 392 U.S. 1, 21. A court must determine whether, at the moment of seizure, the officer had reasonable suspicion that the defendant was engaged in criminal activity. See, e.g., United States v. Goodrich, 450 F.3d 552, 560 (3d Cir. 2006); Johnson v. Campbell, 332 F.3d 199, 205 (3d Cir. 2003). "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (citing United States v. Sokolow, 490 U.S. 1, 7 (1989)). "[T]he reasonable suspicion determination must be based on commonsense judgments and inferences about human behavior." Wardlow, 528 U.S. at 120. The minimal level of objective justification articulated must be more than an "inchoate and unparticularized suspicion or 'hunch.'" Wardlow, 528 U.S. at 124 (quoting Terry, 392 U.S. at 7). To determine whether there was sufficient evidence to establish reasonable suspicion for a Terry stop, courts consider the totality of the circumstances of the facts known to the officer at the time of seizure. Id. Courts generally defer to officer knowledge and experience in determining whether the totality of the circumstances establishes grounds for reasonable suspicion. See, e.g., United States v. Arvizu, 534 U.S. 266, 274 (2002); Ornelas v. United States, 517 U.S. 690, 700 (1996); United States v.

Robertson, 305 F.3d 164, 167 (3d Cir. 2002).  In order to conduct a Terry frisk, an officer must

have a reasonable suspicion that the suspect is "armed and presently dangerous"—a slightly

different consideration than determining if an officer had reasonable suspicion of criminal activity

to conduct a Terry stop.  United States v. Murray, 821 F.3d 386, 393 (3d Cir. 2016).

The totality of the circumstances supports the officers' reasonable suspicion to conduct

both a Terry stop and frisk.  First, Taylor's seizure occurred at almost 9:00 p.m. in an area that had

a reputation as an open-air drug market plagued with violent crime.  See United States v. Goodrich,

450 F.3d 525, 561 (3d Cir. 2006) (considering a high crime area at night as a factor in the

reasonable suspicion analysis).  Second, the officers initially observed Taylor adjusting what

appeared to be an "object" in his pants area.  Taylor contended that this is simply "what many men

do."  Contrastingly, the government argued that the officers believed, based on their experience,

that Taylor was concealing a firearm.  Deference is given to the experience of police officers in

determining when a seemingly innocuous or legal act is indicative of some sort of criminal activity.

See United States v. Sears, 835 F.App'x 671, 674 (3d Cir. 2020) (weighing the adjustment of a

waistband as a factor in the reasonable suspicion analysis).  Officer Kelly's experience included

making twenty-five to thirty firearm arrests or recoveries in 2023, the year prior to the incident in

this case.  Officer Kelly further testified that "[f]rom [his] prior experiences of making arrests for

firearms and narcotics, the waistband is a very common area to conceal both of those things."

Third, Taylor took unprovoked flight in the middle of his initial interaction with the officers.  See

Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (holding that headlong flight in combination with a

high crime area was enough to raise reasonable suspicion); United States v. Pigford, F. Supp. 3d

443, 450 (E.D. Pa. 2021) (finding that high crime area and flight from police pointed toward

reasonable suspicion under the totality of the circumstances).  While fleeing, the officers observed

Taylor crouching behind and between parked cars.  Based on the officers' prior experience, Taylor's furtive movements suggested an attempt to hide an object—such as the gun the officers had suspected Taylor had on his person.  See United States v. Brown, 159 F.3d 147, 150 (3d Cir. 1998) (factoring in high crime area, police expertise, and flight from officers to support finding of reasonable suspicion).  Although each of these factors taken separately may not be enough to establish reasonable suspicion, the totality of the circumstances is sufficient for both the Terry stop and frisk.  The officers had reasonable suspicion that Taylor was engaged in criminal activity, and that he was armed and dangerous.

Taylor was not seized under the meaning of the Fourth Amendment until after he ceased his flight from the officers and they frisked him for weapons.  The officers had reasonable suspicion to lawfully frisk Taylor.  Therefore, the Terry stop and subsequent frisk were not in violation of the Fourth Amendment, and the evidence consequently obtained was not "fruit of the poisonous tree."

## II.    THE OFFICERS HAD PROBABLE CAUSE TO ARREST AND SEARCH TAYLOR.

The officers had probable cause to arrest and search Taylor.  Police officers must have probable cause to lawfully arrest someone.  United States v. Laville, 480 F.3d 187, 194 (3d Cir. 2007).  Probable cause depends upon whether the totality of the circumstances at the time of arrest would lead a reasonable person to believe that a crime has been committed.  See Devenpeck v. Alford, 543 U.S. 146, 152 (2004); Beck v. Ohio, 379 U.S. 89, 96 (1964).  Probable cause is construed as "a fair probability that contraband or evidence of a crime will be found."  United States v. Ramos, 443 F.3d 304, 308 (3d Cir. 2006).  Once a suspect has been lawfully arrested with probable cause, it is reasonable under the Fourth Amendment for an arresting officer to search the

suspect's person and "the area within the arrestee's immediate control." <u>Riley v. California</u>, 573 U.S. 373, 382 (2014).

When the officers lawfully seized Taylor, he told them that he did not have a gun in his possession but voluntarily admitted to having heroin. After frisking Taylor for weapons, the officers recovered what appeared to be a bundle of heroin in his pocket. It was after the officers frisked Taylor and recovered the heroin that they placed Taylor in the back of the patrol car and he was arrested. Taylor's admission of drug possession and the officers' recovery of illicit drugs form the basis of the officers' reasonable belief that Taylor had committed a crime. Therefore, the officers had probable cause to arrest Taylor.

## <u>CONCLUSION</u>

Taylor's frisk was supported by reasonable suspicion. His arrest and search incident to arrest were supported by probable cause. Thus, all evidence flowing from and following the seizure—including the on-scene statements and the later obtained DNA—was obtained lawfully and is not fruit from the poisonous tree. Therefore, the Court hereby denies Taylor's motion to suppress in its entirety.

BY THE COURT:

**HON. KAI N. SCOTT**
**United States District Court Judge**